IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JANE & JOHN DOE, individually, and as parents and next friends of A. DOE, a minor, **Plaintiffs,** v. BAYLOR COLLEGE OF MEDICINE. **Defendant.** | CIVIL ACTION NO: 4:25-CV-04482 |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(i)(B), Plaintiffs Jane & John Doe, individually, and as parents and next friends of A. Doe[1] (collectively, "Plaintiffs") by and through undersigned counsel, hereby file this First Amended Complaint against Baylor College of Medicine ("Defendant BCM" or "BCM"). In support of their Complaint, Plaintiffs respectfully show this Court as follows:

### Introduction

This case arises from Baylor College of Medicine's neglect to take adequate measures to safeguard vulnerable patients from an intentional privacy violation by one of its residents. BCM Resident Dr. Ethan Haim—at all times acting within the course and scope of his residency—

---

[1] Plaintiffs filed an Original Petition in Texas state district court on September 18, 2025. The case was removed by Defendant on diversity grounds on September 22, 2025. In their state court Original Petition, Plaintiffs proceeded pseudonymously as allowed under the Texas Rules. *See* Tex. R. Civ. P. 21c(a)(3). The case having been removed, Plaintiffs are filing a Motion to Proceed Under Pseudonym and to Seal Identifying Information concurrently with this First Amended Complaint.

stole children's private medical information from Texas Children's Hospital (TCH) and published it through national media.

The intentional dissemination of private patient information falls far short of the standard of care, and Dr. Haim's malicious scheme to misappropriate and publish the patient records of minor children receiving gender-affirming care was both foreseeable and preventable by BCM. In violation of the Minimum Necessary rule and other patient privacy standards, Dr. Haim used the credentials and access codes granted to him as a resident and employee of BCM to access records of patients that he had never treated and at an institution, TCH, at which he no longer even held privileges.

On information and belief, BCM knew or should have known about Dr. Haim's scheme. On information and belief, Dr. Haim openly shared his plans with one or more co-conspirator employees of BCM and/or TCH to act as a "whistleblower" by exposing gender-affirming care that was completely legal but to which he personally objected. Indeed, on information and belief, Dr. Haim had previously attempted to access the same records on one or more occasions and had been denied access. Rather than raising any red flags, discipline, or revocation of privileges, these failed attempts to purloin patient information did not result in any consequences or preventative measures from Dr. Haim's employer, BCM. Instead, BCM retained Dr. Haim, failed to adequately supervise him, and allowed him to try again—and this time succeed—in accessing records he had no business accessing and publishing them in national media.

The Plaintiffs in this case include A. Doe, one of the children whose private medical information was leaked by Dr. Haim, and their parents, Jane and John Doe. Defendant's actions and negligence have endangered the Plaintiffs and caused them immense mental anguish and distress.

## I. PARTIES

1. Plaintiffs Jane and John Doe bring this suit individually and as parents and next friends of A. Doe, a minor. A. Doe is transgender youth who has been diagnosed with gender dysphoria and was undergoing legal, appropriate, evidence-based medical care for treatment of their gender dysphoria at Texas Children's Hospital until May of 2023. Jane, John, and A. Doe were all residents of Harris County, Texas, at the time of the events in this Complaint; they are now residents of Los Angeles County, California.

2. Defendant Baylor College of Medicine is a private medical school based in Houston, Texas, that employed Dr. Haim via its residency program at the time of the events in this Complaint. Defendant has its principal office in Harris County, Texas, and may be served via its counsel of record in this matter.

## II. JURISDICTION AND VENUE

3. This Court has diversity jurisdiction over Plaintiffs' state law claims as the amount in controversy exceeds $75,000 and the dispute is between citizens of different states. *See* 28 U.S.C. § 1332.

4. Accordingly, removal to this Court is proper pursuant to 28 U.S.C. §§ 1441(a) and 1446 because the Southern District of Texas, Houston Division, is the federal district and division that embraces the 234th District Court of Harris County, Texas. *See* 28 U.S.C. § 124(d)(3).

## III. FACTUAL BACKGROUND

5. On May 16, 2023, illegally obtained copies of multiple transgender children's confidential health information were published to the world on social media and elsewhere on the internet. The "leak" of this confidential health information came from Texas Children's

3

Hospital ("TCH"), where A. Doe had been receiving comprehensive care. The information was stolen by a BCM Resident, Dr. Eithan Haim, who had accessed the patients' medical records even after his rotation at TCH had ceased.

6. Dr. Haim gave the stolen information to precisely the people whose use of it would cause the greatest possible injury to Plaintiffs and the other patients similarly in their position. Dr. Haim sent it to individuals and groups who politically oppose transgender healthcare, who characterize medically appropriate, evidence-based, and industry-standard treatment for gender dysphoria as child abuse, and who publicly vilify parents who allow their transgender children to receive such care.

7. While the care obtained and provided to the Plaintiffs has been approved and sanctioned by every major medical and psychological association and is in accordance with best medical care practices, anti-trans individuals and groups like those to whom Dr. Haim leaked A. Doe's information nonetheless target and attack families who need and receive this care, and employ unethical and hateful tactics to do so.

8. Dr. Haim is not a "whistleblower," as a "whistleblower" is someone who reveals malfeasance, corruption, or violations of the law. No law was broken, and the care provided was medically necessary according to the applicable standards of care, and desired and consented to by all parties. Dr. Haim violated medical ethics, the standard of care for protecting patient privacy, and the laws protecting the privacy of people who were not even his own patients, on the basis of his personal disagreement with their legal medical choices.

9. Jane and John Doe are not ashamed that they provided (and still seek to provide, albeit in another state) the care their child needed, consistent with the best medical science available. However, in a climate of anti-transgender sentiment fostered by people like Dr. Haim,

the widespread publication by Defendant's agent, Dr. Haim, of Plaintiffs' family medical choices has been and continues to be both terrifying and dangerous.

10. Dr. Haim's actions were calculated to create and have created reputational, professional, and mental health harm to Plaintiffs. The leaking of confidential information, including confidential medical information, related to various transgender kids and their families was devastating and created immense risk, not the least of which is to the physical safety of the children and their families.

11. On or about May 16, 2023, Jane and John Doe learned through friends and through media reports that medical records of transgender patients at TCH, including the records of their child, A. Doe, had been given to a blogger and activist working with the Manhattan Institute.

12. These patient records include patient names, ages, diagnoses, treatments, appointment dates and exact times, referring physician, procedure details, and even room numbers.

13. The blogger made copies of these patient records available for anyone to download from his own website. These copies "redacted" the names, dates of birth, photos, and medical record numbers with a haphazard red marker-type electronic covering, but disclosed the patients' ages; genders; diagnoses; appointment dates, times, and room numbers; treatment and procedure notes and details; providers and referring provider names. Even with the redactions, the remaining details create a strong possibility that a sufficiently interested person could determine the identities of the patients or their parents.

14. Dr. Haim himself had no need to access the records under relevant privacy laws. Yet, Dr. Haim, the blogger, and anyone else with whom Dr. Haim may have shared the records have access to unredacted copies of them.

15. The blogger linked these patient records in publications on multiple websites, across multiple social media platforms, and even sent links to email subscribers. He also included screenshots of the semi-redacted records on numerous social media posts and in a YouTube video that have collectively been viewed more than two million times as of the date of this filing. Per Dr. Haim and the blogger's public statements, over 8 million people viewed the article linking the records.

16. Dr. Haim was a resident in BCM's general surgery residency program from 2018 until he graduated on June 23, 2023. Rotations through this residency program include public hospitals Ben Taub Hospital and Michael E. DeBakey VA Medical Center, and private hospitals Baylor St. Luke's Medical Center, The University of Texas MD Anderson Cancer Center, and Texas Children's Hospital.

17. Dr. Haim worked at TCH during his residency, but, on information and belief, he was no longer working at TCH when he accessed, downloaded, and released A. Doe's medical records. He never had a treating relationship with A. Doe.

18. Dr. Haim provided patient records to the blogger with the intent that the blogger publish those records and/or the information contained therein. In January 2023, Dr. Haim, according to his own public statements, began what would be a five-month-long campaign of reaching out to numerous media outlets and public figures whom he believed opposed gender-affirming healthcare and would be interested in publishing the information he had. Jane and John

Doe do not know to how many of these outlets and individuals Dr. Haim sent their child's medical records.

19. While Dr. Haim has repeatedly stated in interviews that the records were semi-redacted when published, he has never indicated that they were semi-redacted when he was shopping them around in search of a publisher. In any case, Dr. Haim had, and likely still has, access to fully unredacted copies of the records.

20. It is currently unknown exactly how much information Dr. Haim provided to the blogger, the Manhattan Institute, other prospective publishers, or their associated publications or political allies beyond what has already been published on their websites and social media platforms, but on information and belief, Dr. Haim shared the information broadly in his campaign to publish the confidential information and harm Plaintiffs.

21. It is the duty of every health professional and health care provider to protect private patient information and comply with the variety of state and federal laws and regulations protecting patient privacy. Protecting patient privacy is part of providing health care, is part of the job responsibilities of every health professional, and was in the course and scope of Dr. Haim's responsibilities as a resident at BCM. Protecting patient privacy is part of the job.

22. BCM knew or should have known that Dr. Haim posed a serious risk to the privacy of transgender and gender dysphoria patients. Dr. Haim remains and, on information and belief has long been a loud, proud, and open critic of gender-affirming care. He has never made a secret of his views on these or other matters, including espousing them on one or more podcasts and in Congressional testimony.

23. On information and belief, Dr. Haim's hostility toward and crusade against gender-affirming care were not secret but were widely discussed by him with colleagues and

other BCM employees. This belief is supported by Dr. Haim's recent public statements in which he describes working for more than five months, beginning in Fall 2022, to obtain and release the private patient information, and his proud self-description as a "whistleblower" for having taken this action at Plaintiffs' expense.[2]

24. On information and belief, even before publication, Dr. Haim indicated that he considered disclosing patient records of gender-affirming care patients to be an act of "whistleblowing" rather than the willful violation of privacy rights that it was.

25. On information and belief, as well as based on documents from his prior criminal indictment, Dr. Haim made one or more failed attempts to access transgender children's patient records from TCH using his BCM credentials between September 2022 and April 2023 before finally succeeding.[3]

26. Notably, just a month before the records were published, he emailed the TCH administrator to request that his login credentials be restored. Additionally, on April 24, 2023, his login activity indicated that he had accessed pediatric patient files. This belief is supported by Dr. Haim's public statements confirming that he had worked to release the records for months before successfully publishing them.

27. Based on the timeline and on information and belief, Dr. Haim had misappropriated the information sometime before they were published in May, and BCM either

---

[2] *See, e.g.* Testimony of Dr. Ethan Haim, "Ending Lawfare Against Whistleblowers Who Protect Children," Hearing before the The U.S. House Judiciary Subcommittee on the Constitution and Limited Government, April 9, 2025, *available at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/haim-testimony.pdf (hereafter "Haim Hearing Testimony").

[3] *See United States of America v. Ethan David Haim*, Case No. 4:24-cr-00298, Dkt. No. 110, "Second Superseding Indictment" (S. D. Tex. Nov. 20, 2024).

failed to detect the unauthorized access and misappropriation or took no preventative or remedial action.

28. On information and belief, and based on Dr. Haim's public statements and testimony, Dr. Haim worked with one or more other individuals employed by BCM and/or TCH to gain access to Plaintiffs' records.

29. Despite that it knew or should have known about Dr. Haim's open contempt for these patients' privacy rights, his prior attempts to improperly access their records, and his solicitation of one or more coconspirators, BCM did not discipline, train, supervise, terminate, limit credentials, or take any other action to prevent its employee, Dr. Haim, from carrying out his scheme to improperly publish private patient information.

30. Defendant BCM has a duty to adequately and thoroughly investigate candidates for its residency program before hiring them. On information and belief, Defendant BCM failed to adequately and thoroughly investigate its resident, Dr. Haim, before hiring him. This failure led to Dr. Haim having access to the private medical information of a category of patients he had been openly antagonistic towards.

31. Defendant has a duty to take appropriate action when it learns that one of its residents is unfit for their role, thereby creating an unreasonable risk of harm to others. On information and belief, Defendant BCM failed to take appropriate action—such as dismissing the resident from the general surgery program or at least limiting his access to records he had no proper purpose in accessing—when it learned of his intentions and prior attempts.

32. Defendant has a duty to adequately supervise the residents in its residency program. On information and belief, Defendant BCM failed to adequately supervise its resident, Dr. Haim, by not ensuring that he adhered to the laws of confidentiality. As a result of this

negligent supervision, Dr. Haim was able to access and then disseminate the confidential medical records of A. Doe.

33. On information and belief, Defendant BCM knew or should have known about Dr. Haim's plan and intent to willfully violate Plaintiff's privacy as he was known to have been outspoken.[4]

34. Despite Dr. Haim's egregious and unethical conduct during his general surgery residency, he was allowed to finish his residency with BCM in June 2023.

35. Since the public release of confidential medical information about A. Doe, Plaintiffs have been living in fear. Plaintiffs have since made the decision to flee their home and the state of Texas in significant part due to the increased threat to their child's safety created by the unauthorized disclosure of their confidential medical information by BCM's resident, Dr. Haim.

36. The trauma this theft and publication has inflicted on Plaintiffs cannot be overstated. The Plaintiffs have faced increased anxiety, depression, and insomnia since learning of the leak. The ability to trust healthcare providers and institutions has been lost. In the words of Jane Doe: "We will never feel safe walking into a doctor's office again. We will always worry if someone who has access to our child's private records will try and do her harm."

37. The breach of their child's medical privacy has left the Doe family with an overwhelming sense of fear, vulnerability, and betrayal. Because of the safety concerns they now face, Jane and John Doe decided to leave their livelihoods in Texas to relocate to another state. The Doe family scrambled to sell their home, find new jobs, and find a new place to live while

---

[4] Haim Hearing Testimony, *supra* Note 3.

living in fear of harassment or violence from hostile actors who have an unknown amount of private information about their family.

## IV. CAUSES OF ACTION

### COUNT ONE:
### Unauthorized Release of Confidential Information pursuant to
### TEX. OCC. CODE § 159.009

38. Plaintiffs incorporate each of the foregoing paragraphs as if they were fully set forth herein.

39. Under TEX. OCC. CODE § 159.002(a)–(b), communications between a physician and a patient, relative to or in connection with any professional services as a physician to the patient, including any record created or maintained by a physician of the identity, diagnosis, evaluation, or treatment of a patient by a physician, are confidential and privileged and may not be disclosed.

40. Dr. Haim was acting within the course and scope of his BCM residency at the time of the events in this Complaint.

41. Defendant BCM is liable for the actions of its resident, Dr. Haim, which proximately caused the unauthorized disclosure of A. Doe's personal medical information and caused the Plaintiffs to suffer the resulting harm. These breaches collectively constitute the unauthorized release of confidential and privileged communications in violation of TEX. OCC. CODE § 159.

42. Plaintiffs are therefore entitled to recover damages under TEX. OCC. CODE § 59.009.

## COUNT TWO:
## Negligent Hiring

43. Plaintiffs incorporate each of the foregoing paragraphs as if they were fully set forth herein.

44. In addition, or alternatively, Plaintiffs bring a claim for negligent hiring. Dr. Haim was acting within the course and scope of his BCM residency at the time of the events in this Complaint.

45. Defendant BCM owed Plaintiffs a legal duty to adequately and thoroughly investigate its residents prior to hiring them.

46. Defendant breached this duty by failing to adequately and thoroughly investigate Dr. Haim before hiring him into BCM's residency program, and such breach was a proximate cause of Plaintiffs' injuries and damages as set forth above.

47. Plaintiffs' injuries and damages were a foreseeable outcome of negligent hiring because, on information and belief, Dr. Haim had been very vocal about his antagonistic and harmful ideologies about the transgender community, which would have been known to BCM had it done an adequate and thorough investigation prior to hiring him.

## COUNT THREE:
## Negligent Retention

48. Plaintiffs incorporate each of the foregoing paragraphs as if they were fully set forth herein.

49. In addition, or alternatively, Plaintiffs bring a claim for negligent retention.

50. Dr. Haim was acting within the course and scope of his BCM residency at the time of the events in this Complaint.

51. Defendant BCM owed Plaintiffs a legal duty to discharge or reassign residents whose actions since hiring have demonstrated that they are unfit for their role, or whom BCM knew or should have known intended to violate patients' rights.

52. Defendant BCM breached this duty when it retained its resident, Dr. Haim, both after it knew or should have known of his scheme and or that he posed a risk of committing such a violation, and even after he leaked A. Doe's medical records.

53. Defendant BCM's breach proximately caused Plaintiffs' injuries and damages as set forth above because, if BCM had fulfilled its duty and dismissed Dr. Haim from its residency program, then, based on information and belief, Dr. Haim would not have been able to access A. Doe's confidential medical records.

54. Plaintiffs' injuries and damages were a foreseeable outcome of negligent retention.

## COUNT FOUR:
### Negligent Supervision and Enforcement

55. Plaintiffs incorporate each of the foregoing paragraphs as if they were fully set forth herein.

56. In addition, or alternatively, Plaintiffs bring a claim for negligent supervision and enforcement.

57. Dr. Haim was acting within the course and scope of his BCM residency at the time of the events in this Complaint.

58. Defendant BCM owed a legal duty to Plaintiffs to exercise that degree of care and diligence exercised by other providers in the same or similar circumstances with respect to the supervision of its residents, enforcement of policies and procedures, and compliance with State and Federal privacy laws.

59. Defendant BCM breached this duty when it failed to supervise its resident, Dr. Haim, and enforce its policies in such a way that would protect the private, sensitive health information and medical records of patients.

60. Defendant BCM's negligent supervision and enforcement were a proximate cause of Plaintiffs' damages as set forth above.

61. Plaintiffs' injuries and damages were a foreseeable outcome of negligent supervision and enforcement.

## COUNT FIVE:
## Public Disclosure of Private Facts

62. Plaintiffs incorporate each of the foregoing paragraphs as if they were fully set forth herein.

63. Publicity was given to matters concerning the private life of A. Doe, as well as Jane and John Doe, when Dr. Haim took A. Doe's private medical information and disseminated that information to various media outlets with the intent of it being publicized.

64. The publication of the A. Doe's private life was highly offensive and would have been highly offensive to any reasonable person of ordinary sensibilities.

65. A. Doe's private medical information was not of legitimate public concern, as it was protected private medical information that was always meant to remain between their family and their medical team.

66. Dr. Haim was acting within the course and scope of his residency with BCM when he accessed and disseminated A. Doe's medical information. Therefore, BCM is vicariously liable for Dr. Haim's tort of publicizing A. Doe's private facts under respondeat superior.

67. Plaintiffs' injuries and damages were a foreseeable outcome of this public disclosure of private facts.

## COUNT SIX:
### Professional Negligence

68. Plaintiffs incorporate each of the foregoing paragraphs as if they were fully set forth herein.

69. The accepted standards of care for a health care provider, such as Defendant, include taking reasonable measures to protect patient privacy and comply with patient privacy laws.

70. Defendant departed from these accepted standards of care by disclosing Plaintiff A. Doe's private medical information and by failing to take reasonable precautions to prevent the disclosure of private patient information by its employees.

71. Dr. Haim was acting within the course and scope of his residency with BCM when he accessed and disseminated A. Doe's medical information. Therefore, BCM is vicariously liable for Dr. Haim's actions.

72. Defendant's departure from these accepted standards of care proximately resulted in Plaintiff's injuries and damages.

### VII.     DAMAGES AND ATTORNEYS' FEES

73. As a consequence of the foregoing facts and the willful and malicious nature of the wrongs committed against Plaintiffs, Plaintiffs have suffered and will suffer past, present, and future economic loss, for which Plaintiffs plead to recover at trial. The backpay and reinstatement/front pay damages sought are within the jurisdictional limits of this court.

74. As a consequence of the foregoing facts and the willful and malicious nature of the wrongs committed against Plaintiffs, Plaintiffs have suffered and will suffer past, present,

and future mental anguish, for which Plaintiffs plead to recover at trial. The damages for said mental anguish and other compensatory damages sought are within the jurisdictional limits of this court.

75. As a consequence of the foregoing clear and convincing facts and the willful and malicious nature of the wrongs committed against Plaintiffs, Plaintiffs are entitled to exemplary damages.

76. It was necessary for Plaintiffs to retain the undersigned attorney to prepare and prosecute this suit, and they seek to be awarded their reasonable and necessary attorneys' fees and costs of court.

## VIII. DEMAND FOR JURY TRIAL

77. Plaintiffs respectfully demand a jury trial.

## IX. PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs respectfully request that Defendant be cited to appear and answer and that, upon a final hearing of this matter, the Court enter judgment in favor of Plaintiff and against Defendant and award to Plaintiffs:

A. Actual damages, in an amount to be determined at trial, as set forth above;

B. Compensation for wages lost during the period of suspension, termination, or constructive discharge, including back pay and lost benefits;

C. Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

D. Exemplary damages;

E. Court costs;

F. Reasonable attorney fees for prosecution of this case at trial and on appeal;

G. All costs of expert witnesses and other costs of litigation;

H.   Pre-judgment and post-judgment interest, as provided by law;

I.   Such other and further relief to which Plaintiffs may be entitled at law or in equity.

Dated: November 4, 2025                      Respectfully submitted,

**Holt Major Lackey, PLLC**

By: _/s/ Holt Major Lackey_
   Holt Major Lackey
   Texas Bar No. 24047763
   Email: holt@holtmajorlackey.com
111 W. Anderson Ln., Ste. D-211
Austin, Texas 78752
Telephone: 512-949-9598

**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2025, the foregoing document was served on all counsel of record for Defendant Baylor College of Medicine by email and via the Court's electronic filing system.

_/s/ Holt Major Lackey_
Holt Major Lackey